UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Case No. CV420-291 |
| | ) | |
| 9545 STONEY RIDGE LANE | ) | |
| ALPHARETTA, GEORGIA 30022 | ) | |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

COMES NOW the United States of America, (the "United States" or the "Government"), by and through Bobby L. Christine, United States Attorney for the Southern District of Georgia, and Xavier A. Cunningham, Assistant United States Attorney, and brings this Verified Complaint for Civil Forfeiture *In Rem*, with the following allegations:

**NATURE OF THE ACTION**

1. *In Rem* civil forfeiture is permissible under Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

2. The Defendant Property is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), because it constitutes real property involved in a transaction or attempted transaction in violation of section 18 U.S.C. § 1956.

**THE DEFENDANT *IN REM***

3. The Defendant in this case is real property located at 9545 Stoney Ridge Lane, Alpharetta, Georgia 30022-7801, the legal description for which is as follows:

> ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN
> LAND LOT 17 OF THE 1ST DISTRICT, 1ST SECTION, FULTON

COUNTY, GEORGIA, BEING LOT 304, BLOCK A, THE RIDGE AT BRUMBELOW SUBDIVISION, UNIT III-A, AS PER PLAT RECORDED IN PLAT BOOK 205, PAGES 60-62, FULTON COUNTY, GEORGIA RECORDS AND BEING FURTHER IDENTIFIED ACCORDING TO THE OFFICIAL TAX MAP OF SAID COUNTY BY PIN: 11-0090-0017-042-1,

(hereinafter, the "Defendant Property").

## JURISDICTION AND VENUE

4. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a). This Court has *In Rem* jurisdiction over the Defendant Property under 28 U.S.C. § 1355(b).

5. Venue is proper pursuant to 28 U.S.C. § 1395 as the Defendant Property is currently located within the Southern District of Georgia, and some of the acts described herein haves a nexus to on-going criminal activity that is currently under Indictment in the Southern District of Georgia.

## BASIS FOR FORFEITURE

6. On October 13, 2020, a federal grand jury sitting in the Southern District of Georgia returned a Four-Count, Third Superseding Indictment against Dali Bagrou (hereinafter, the "Defendant in the criminal case" or "Bagrou"), and several other individuals and entities, charging violations of 18 U.S.C. § 371 (Count One – Conspiracy); 50 U.S.C. § 4801 et seq., (Count Two – Export Control Reform Act); 18 U.S.C. § 1349 (Count Three – Wire Fraud Conspiracy); and 18 U.S.C. §1956(h) (Count Four – Money Laundering Conspiracy).

7. The grand jury's return of the Indictment against the Defendant establishes probable cause that the charged offenses were committed.

8. The Indictment further contained a Forfeiture Allegation that declared the forfeitability of the Defendant Property as real property involved in, or traceable to property obtained during the commission of the Title 18 offense alleged in the Third Superseding Indictment.

## FACTS

9. Beginning in or around February 2017, and continuing through the time of the Third Superseding Indictment, Bagrou, aided and abetted by others, conspired to willfully export, attempt to export, and attempt to cause the exportation of a Vectra 40G power turbine[1] (hereinafter the "Commodity") from the United States to Russia, to be used directly or indirectly for the exploration, or the production of, oil or gas in Russian deep-waters (greater than 500 feet) or in Arctic offshore locations or shale formations.

10. The Bureau of Industry and Security ("BIS"), within the U.S. Department of Commerce requires an export license for the export of the Commodity.

11. Thus, it is a violation of Title 50, United States Code, Sections 1702 and 1705; and 15 C.F.R. Part 746.5 and 764.2(a)-(k) to export the Commodity without first having obtained the required licenses or authorizations from BIS.

---

[1] Vectra 40G power turbine is designed and manufactured for integration with gas generators to enable direct drive of high power gas compressors.

12.     At no time did Bagrou or any of the named co-Defendants in the criminal case apply for, receive or possess a license or authorization from BIS, to export the Commodity.

13.     As it was set forth in the Criminal Indictment, as a part of the conspiracy Bagrou, aided and abetted by others, entered into contracts for the purpose of procuring the Commodity

14.     Further, as alleged in the criminal Indictment, the contracts contained materially false information intended to obscure the true end user, and the end use of the Commodity.

### Details of the Conspiracy

15.     World Mining and Oil Supply ("WMO") advertised as a sourcing and supply company that specialized in industrial, mining, and oil and gas products. Its corporate office was located in Dacula, Georgia.

16.     Bagrou was the President, Owner and Managing Director of Defendant WMO, and operated from the WMO offices in Dacula, Georgia.

17.     GVA International Oil and Gas Services (a/k/a "GVA International DMCC") (hereinafter, "GVA"), based in Italy, was a business that offered services in electrical engineering, mechanical and HVAC engineering, and energy and communication systems in the oil/gas, petrochemical, manufacturing and energy industries.

18.     GVA is a co-defendant in the criminal case, as is Gabriele Villone ("Villone"), who is GVA's Commercial Director and Manager.

19. Bruno Caparini ("Caparini"), another co-defendant in the criminal case, was the Commercial Director of an Italian engineering and construction company based in Italy.

20. KS Engineering (a/k/a "KS-Inzhiniring Co. LTD." and "KS-Inzhiniring, LLC,") ("KS"), also a co-defendant in the criminal case, was an engineering service company based in St. Petersburg, Russia that specialized in systems for coal, gas, oil, nuclear and renewable energy power plants.

21. Anton Cheremukhin ("Cheremukhin") was an employee of KS and is a co-defendant in the criminal case.

22. Oleg Vladislavovich Nikitin ("Nikitin"), was the General Director of KS, and is a co-defendant in the criminal case.

23. Company A is a U.S. based company whose identification will be kept secret throughout this civil ligation as it is in the parallel criminal proceeding.

24. Company B was a Russian government-controlled business based in Moscow and St. Petersburg, Russia that engaged in the extraction, production, transportation and sale of oil and gas. The identification will be kept secret throughout this civil ligation as it is in the parallel criminal proceeding.

25. On or about September 14, 2017, Bagrou contacted Company A via email and requested a service manual for the Commodity, stating that the company he represented wanted to couple it with a General Electric gas generator model LM2500 (the "LiM2500 Gas Generator"). Company A replied that it would only share its

proprietary information with bona fide end users of the Commodity or their authorized agents.

26. On or about October 18, 2017, Bagrou falsely responded to Company A via email that his company, WMO, would be the end user of the Commodity and that it would be used in Atlanta, Georgia.

27. On or about October 24, 2017, Company A replied to Bagrou that it knew the Commodity would not be installed in Atlanta, Georgia, and reiterated that Company A required full disclosure of end use/end user information to comply with European Union and United States export law. On the same date, Bagrou forwarded Company A's email to Villone.

28. On or about October 24, 2017, Villone. drafted a series of materially false responses and other information, such as, "[the Commodity] will be buy (sic), delivered, 'installed' literally in United States Atlanta facilities, "and "no export outside US." Villone emailed the response to Bagrou and directed him to send it to Company A.

29. On or around April 2017, Caparini met with representatives of Company A and attempted to procure the Commodity. He was unsuccessful.

30. On or about December 1, 2017, Caparini contacted Company A and inquired again about purchasing the Commodity.

31. On or about January 19, 2018, Company A asked Caparini to provide specific information about the end use/end user of the Commodity.  Caparini forwarded the request to Villone.

32. On or about January 19, 2018, Villone instructed Caparini to write back to Company A that, "we are the end User in name of our owned Group Company: GVA International DMCC, based in Dubai UAE as we are the owner of all equipment. Our intention is to produce and sell Energy not the equipment." As Villone and Caparini then knew, that information was false. Company A declined to make the sale to Caparini or GVA.

33. On or about February 27, 2018, KS, by and through Cheremukhin and Nikitin, sent a draft contract proposal to GVA. In the contract, GVA agreed to obtain and sell the Commodity to KS. The agreement falsely stated that the Commodity would be used at the "Mordovskiy sugar factory, LLC," in Russia, which the parties to the contract and their representatives knew to be false.

34. On or about March 5, 2018, KS, by and through Cheremukhin and Nikitin, submitted a technical proposal to Company B, in which KS proposed to provide the Commodity to Company B for use with the LM2500 Gas Generator as part of a Turbogenerator on the Prirazlomnaya Marine Ice-Resistant Stationary Platform.

35. On or about June 22, 2018, with the advice and direction of Villone, Bagrou contacted Company A and again inquired about purchasing the Commodity. Bagrou told Company A it was for a power plant that Bagrou was purportedly planning to build near Atlanta, Georgia. In fact, as Villone and Bagrou then knew, Bagrou had no plans to build a power plant in Georgia.

36. On or about July 19, 2018, Villone sent a letter on behalf of GVA to KS, confirming GVA's receipt of KS's advance payment on May 8, 2018, and predicting delivery of the Commodity and other components to KS on November 1, 2018.

37. On or about July 20, 2018, Cheremukhin forwarded Villone's letter to Company B's Deputy Head of Office, Head of the MTR Supply Department, Office of Material and Technical Provision.

38. On or about July 23, 2018, Bagrou, with the assistance and direction of Villone, provided Company A with an affidavit and description of a proposed plan to use the Commodity to build a power unit generator in Savannah, Georgia, a plan which Villone and Bagrou knew to be fictitious and false.

39. On or about September 18, 2018, Villone emailed Cheremukhin the fictitious and false affidavit, and business plan submitted to Company A as evidence that Bagrou and Villone could successfully procure the Commodity from Company A.

40. On or about September 30, 2018, Villone emailed Bagrou a series of instructions regarding additional false and fictitious information Bagrou was to provide to Company A.

41. On or about October 10, 2018, a Undercover Agent ("UCA") based in Savannah, Georgia informed Bagrou that Company A was concerned the Commodity would be exported from the United States without a license to be installed on foreign military naval vessels. Bagrou assured the UCA that the Commodity would remain in the United States after its purchase from Company A. Additionally, Bagrou assured the UCA that he was not ordering the Commodity on behalf of another person or company.

42. On or about October 15, 2018, Villone emailed Bagrou a contract between GVA and Bagrou's company, which contract purported to establish a joint venture to build a "portable temporary generation power project." As Villone and Bagrou then knew, no such project was actually contemplated and the phony contract was created for the purpose of deceiving Company A.

43. On or about November 1, 2018, Villone emailed Bagrou another series of instructions regarding additional false and fictitious information which Bagrou was to provide to Company A.

44. On November 2, 2018, Company B sent a letter via email to KS and Nikitin, reminding KS and Nikitin of the Supply Agreement and stating, "this is to advise you that in the event of another failure to supply the Product on time, [Company B] will have significant financial losses."

45.     Between, on or about November 23, 2018, and on or about December 2, 2018, Bagrou met with Cheremukhin in Dubai, United Arab Emirates, to discuss ordering and transporting the Commodity from the United States to another country without a license from BIS.

46.     On or about November 24, 2018, Villone sent a payment, which originated outside the U.S., from GVA to Bagrou's company in the amount of $980,000.00 USD.  Villone then emailed Bagrou, "first payment as per our contract 15 Oct. 2018 [The Commodity] 980,000 has been sent."

47.     On or about November 24, 2018, Villone emailed Cheremukhin proof of the $980,000.00 payment to Bagrou's company, as well as a projected delivery date for the Commodity by Bagrou's company.  Villone also emailed Cheremukhin the phony "portable Temporary Generation Power project" contract between GVA and Bagrou's company.

48.     On or about November 28, 2018, Cheremukhin emailed a representative of Company B a summary of a meeting between KS, and Company B from the previous day.  The email documented Company B's stated concerns about the delays in delivery and irregularities in financing.  In response, KS "committed to deliver the equipment regardless of the circumstances that impede the implementation delivery (sic)."

49.     On or about November 28, 2018, with the advice and direction of Villone, Bagrou sent proof of $980,000.00 USD in available funds to Company A, and asked for a formal proposal to finalize the sale of the Commodity.

50. On or about December 11, 2018, after Bagrou sent several more inquiries to Company A, Villone forwarded the inquiries to Cheremukhin and cautioned him to wait for Company A's response, stating, "Daily we are pushing them."

51. On or about December 13, 2018, Villone sent multiple payments, which originated outside the U.S., from GVA to Bagrou's company, totaling $1,000,000.00 USD, purportedly for "the project energy [the Commodity]."

52. On or about December 14, 2018, Villone emailed Cheremukhin to inform him about the $1,000,000.00 USD transfer to Bagrou's company.

53. On or about December 21, 2018, in response to a request from Company A for more information about the purported energy project in which the Commodity would be used, Villone emailed Cheremukhin and asked Cheremukhin to help him craft "A PERFECT ANSWER" to Company A's questions about " 'our' project to produce energy."

54. On or about December 26, 2018, Villone requested the assistance of an engineer to assure Company A about the feasibility of the purported energy project, falsely telling the engineer that Bagrou's company was the end user of the Commodity and providing the engineer with the false and fictitious business plan.

55. On or about December 29, 2018, Villone emailed Bagrou a response to Company A's questions about the purported energy project, which Villone and Bagrou both knew contained materially false and misleading information. Villone instructed Bagrou to "remember to save my file in your computer open it and save again then send what you have save (sic)! don't send this file attached directly (my file (sic) are with my computer id)."

56. On or about February 8, 2019, Bagrou received and forwarded a budgetary proposal from Company A for the purchase of the Commodity at $7,500,000.00 USD, which Bagrou forwarded to Villone. Villone then forwarded the proposal (with the Company A price redacted) to Cheremukhin. Villone informed Cheremukhin that the price for the Commodity was higher than expected because it was no longer in production and because it was under a "strict end user control." On or about February 9, 2019, Villone, on behalf of Defendant GVA, sent a Request for Contract Amendment to KS, Cheremukhin and Nikitin based upon the price and delivery time for the Commodity quoted by Company A. In the request, Villone heralded his accomplishment of the "almost impossible mission" of getting Company A to sell the Commodity. He reminded KS personnel that he was able to do so by convincing Company A that the true end user of the Commodity was located in the U.S. Villone went on to state that once GVA had the Commodity, "then from USA we can move [the Commodity] freely and easy between our Company Group Facilities in UAE. . . for delivery to final destination." Pursuant to the amended contract, KS would pay GVA 15.408.587 Euro (approximately $17,300,000.00 USD) for the Commodity.

57. On or about February 23, 2019, after additional questions about the purported energy project from Company A, and after consultation with Villone, Bagrou spoke with a UCA located in Savannah, Georgia, and told the UCA that he would like to purchase the Commodity from a company other than Company A.

58. On or about March 8, 2019, following further conversation with the UCA and after consultation with Villone, Bagrou sent Company A an email confirming he was no longer interested in purchasing the Commodity through Company A. On the same date, Bagrou reached an agreement with the UCA to purchase the Commodity through the UCA's company.

59. On or about March 11, 2019, Bagrou forwarded the email terminating the Company A relationship to Villone, who forwarded the message to Cheremukhin, adding, "All is good on process as agreed and [the Commodity] is under fabrication. We expect to have contract news on next Friday when [UCA] will be back in Houston."

60. On or about April 6, 2019, Villone drafted an email to the UCA which he instructed Bagrou to send, in which Villone and Bagrou agreed to purchase the Commodity from the UCA's company for $6,500,000.00 USD.

61. On or about May 8, 2019, KS, by and through Cheremukhin, entered into a modification of its contract with GVA, by and through Villone, wherein the parties adjusted the previously negotiated payment amounts and delivery date(s) for the Commodity.

62. On or about May 8, 2019, Villone forwarded Cheremukhin photographs of the Commodity and stated, "tomorrow I will travel to USA . . . to meet [the UCA] personally in Georgia. . . . I decided to go personally due to the sensitive step of the deal." Villone also forwarded pictures of the Commodity to Caparini.

63. On or about May 8, 2019, Nikitin texted Villone and stated, "hello Gabrielle I spent some hours with Number 1 today, your photos were in time thank you."

64. On or about May 10, 2019, Villone and Bagrou met with the UCA in Augusta, GA, to discuss the sale of the Commodity to Bagrou's company. The parties agreed that Bagrou and Villone would provide a $2,750,000.00 USD down payment to the UCA's company toward purchase of The Commodity.

65. On or about May 13, 2019, Villone, on behalf of GVA, sent Cheremukhin and KS a letter summarizing his meeting with the UCA. In his letter, Villone wrote, "My personal impression of [the UCA] after 2 hours of discussion is that he is a REAL manager involved in [Company A] business and he considerate (sic) us a very interesting USA 'customer' for our energy production program. He believe (sic) that. He AWARE US (sic) that ROSNEF Company linked from Russia contacted AGAIN ONE MONTH AGO ASKING FOR [THE COMMODITY] from Russia!!!!! Of course [Company A] refuse (sic) but the attention is still very high. Therefore please ask client TO STOP ASKING FOR [THE COMMODITY] We have [the Commodity] now with this way."

66. On or about May 27, 2019, Villone emailed Cheremukhin the pro-forma invoice from the UCA's company and Bagrou's company for the Commodity. Villone advised Cheremukhin they needed to send payment to the UCA's company.

67. On or about June 26, 2019, Bagrou, with the advice and direction of Villone, wired a total of $2,750,000.00 USD; which funds had been previously transferred from a bank account in Poland into a bank account controlled by Bagrou, to an account belonging to the UCA's company inside the United States.

68. Two day prior, on June 24, 2019, a Limited Warrant Deed was executed by husband and wife, Dali Bagrou and Adele Felicite Bagrou. The Limited Warranty Deed was for the purchase of the Defendant Property.

69. On June 25, 2019, Bagrou wired $494,000.00 to Ohlson & Medlock LLC, a real estate law firm with locations in Peachtree Corners, Georgia and Atlanta, Georgia. The transaction appears to be linked to the purchase of the Defendant Property as the Defendant Property is listed in the description section of the wire instructions.

## CLAIM FOR RELIEF

WHEREFORE, the United States of America prays for an Order of Forfeiture permitting the United States to secure its interest in the Defendant Property.

Respectfully submitted,

BOBBY L. CHRISTINE
UNITED STATES ATTORNEY


*/s/ Xavier A. Cunningham*
_____
Xavier A. Cunningham
Assistant United States Attorney
New York Bar Number 5269477

P.O. Box 8970
Savannah, GA 31412
(912) 652-4422

## VERIFICATION OF COMPLAINT FOR FORFEITURE *IN REM*

I, Special Agent John Conley with Bureau of Industry and Security, have read the foregoing Complaint for Forfeiture *in Rem* in this action and state that its contents are true and correct to the best of my knowledge and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This   17   day of November, 2020.

JOHN CONLEY
Digitally signed by JOHN CONLEY
Date: 2020.11.17 09:22:38 -05'00'

_____
JOHN CONLEY
SPECIAL AGENT
BUREAU OF INDUSTRY AND SECURITY
OFFICE OF EXPORT ENFORCEMENT
ATLANTA RESIDENT OFFICE/SAVANNAH